Good morning, Your Honors. May it please the Court, my name is Courtney Stewart-Aldahn, and I represent the appellate, Network Automation. I would like to reserve, if that's okay, three minutes for rebuttal. All right. Watch your clock. It runs down. Today I'm going to concentrate on two of the central issues surrounding the trial court's improper grant of a preliminary injunction in this action. The district court's erroneous finding of a likelihood of initial interest confusion based on an advertisement that makes no reference to AdSea's mark in the text or metatext of the ad. It's identified as a sponsored link and segregated from the organic links on the search results page. It's labeled as a link belonging to Network Automation, and where there is no evidence whatsoever of actual confusion. May I ask you what you put your – did you put this page in front of us, or who offered it? My partner, Brent Blakely, and my colleague did. Okay. Is this before or after the injunction was – This was before. Okay. So show me where the – show me on this where the – your client's name comes up and where advanced system concepts comes up, and how we tell that it's – one is a sponsored link and one is not. Okay. Well, as you'll see, there's on the left-hand side a list of links. There are two sponsored links on this page. One is identified as a sponsored link, and it's in yellow, and this is Apelli's link that identifies www.activebatch.com. That's its business. On the right is a sponsored link that says Batch Job Scheduling, describes our client's product, and identifies www.networkautomation.com. Is this – did this just exhibit one from the record? Yes. So this was the allegedly infringing ad. So as you can see, there's absolutely nothing in the text of the ad. There's no characteristic about this ad that encroaches upon Apelli's mark. There's nothing about the – when viewed in isolation. So there can be nothing about the text as it is presented here. It seems that their complaint is that it is – it comes up in response to a search for their mark. As we all know, though, the Internet user expects to receive a variety of responses to a search. It's not that you input Nike and you expect just a single response in a – to Nike's page. In this instance, as you'll notice, ActiveBatch, the search for term, comes up in 1, 2, 3, 4, 5, 6, 7, 8, 9, every other link. Yet it's Apelli's contention that it is – there's a substantial likelihood that someone is going to view these responses for the search for term ActiveBatch, see the eight responses that say ActiveBatch in bold, in color, highlighted, ActiveBatch, ActiveBatch, ActiveBatch, ActiveBatch. Instead, they will view the single item on the page that makes no reference to ActiveBatch, that identifies instead the competitor, networkautomation.com, and that there's a reasonable likelihood that they're going to say, ah, this one. This one must be sponsored by, endorsed by, and affiliated by ActiveBatch. Here's my mark. Here's the one I was looking for. Do you think our analysis ought to be affected by what sort of user we can expect this search term to involve? Well, I think that if it is, then that certainly works to our client's advantage, considering that the products in question are expensive products and sophisticated users looking for them. No, is that in the record? I was trying to find a declaration or some kind of evidence about how sophisticated the user is, because if I were to – you know, I'm not a very sophisticated web searcher. I don't buy a lot of things off the Internet. So take a person like me. I need to be walked through this, and I wouldn't know if I was clicking on this one or the other one. And maybe it doesn't even really matter to me whether I get ActiveBatch's product or I get your product. Maybe it's not even – it doesn't matter whose product it is. It's just I want a thing that does X. Right. But I didn't find anything in the record. You have a client list, but what does that tell us? Well, we have the price of our products, which range from $995 to $10,995 per license. So, as you know, case law does support looking at the price of the products to determine the sophistication of the Internet user. But I think kind of going back to what you're saying is perhaps a different sort of confusion that isn't appropriately evaluated in the trademark context, which may be a difference between what is an organic search response that's based on the content of the ad and what exactly is a sponsored link. Although it says sponsored link, maybe you're suggesting the casual Internet user might not be familiar with that. That may be the case. I don't personally think that it is. But it's at Apelli's position that even a sophisticated user – and, in fact, they say this in their opposition brief – that even a sophisticated user familiar with organic and sponsored search result distinctions would likely suffer from trademark confusion based on this. If they have a complaint that Google's not making their sponsored links appear as sponsored links, that may be a complaint elsewhere for Google, for the FTC. I don't know. Is there a reasonable likelihood that a consumer is going to suffer from trademark confusion and on some basis something in this ad is going to suggest to them that this product is endorsed by ActiveBatch? It just defies credulity to assert that. And in any event, the injunction that was issued in this action is so overbroad that it permits indisputably permissible activity that we couldn't make a comparative ad. It prevents us from doing things that – from making a comparative ad, from saying ActiveBatch is not a good product. Please try our product instead, consumer. Well, suppose a consumer – you can get to the breadth of the injunction in a moment. But suppose a consumer really wants the ActiveBatch product created by advanced systems concepts. That's the product they want. And they go on here, and they're not as savvy about searching on the web and what sponsored links – I mean, I guess one thing that I would see that could possibly confuse them is that there's two sponsored links, and one of them is advanced systems, and the other is network automation. But it doesn't identify which one is advanced. The sponsored link for advanced systems doesn't identify which one is advanced systems. So the confusion, trademark confusion, is that I click on and buy the batch job scheduling thinking it's ActiveBatch by advanced systems concepts. That's what they have to show, right? Yes, but I would remind you that the search for term was ActiveBatch. So if what you know is this trademark, oh, you saw the ActiveBatch product seems really great. I'd like to find that. So you put it in, and you get these hits, and as you see on the exhibit, ActiveBatch is bold. It's highlighted. It's in every single other search result. But the argument here is that the consumer is likely to believe, oh, which one of these ten is mine? Which one is the ActiveBatch I was looking for? Well, there are eight results that say ActiveBatch, ActiveBatch, all of which would refer to the ActiveBatch product, and there's one result that makes no mention of it. Are you at all disagreeing with the standard that was applied here, how the district court applied the sleek craft factors to this type of alleged confusion? I absolutely do disagree. I think that the sleek craft factors, if we're intellectually honest here, do not provide a meaningful evaluation of whether trademark confusion exists. So to run this, any ad that's key to a trademark, which is a ubiquitous practice on the Internet, and by the way, it's working with remarkable efficiency, and, you know, the market is taking care of this, but that they would believe, I'm sorry, I just lost my track for a second. So is it your position that so long as there's nothing confusing in terms of marked comparison about the link that comes up, that there's no trademark issue? It is, and as far as the sleek craft factors, as we know, they were developed as a proxy for an analysis of confusion, which is the core inquiry in trademark infringement. So your contention is that you could have a link that makes no mention of ActiveBatch, and that would be fine, and you could have a link that directly competes with ActiveBatch. You could have a link for your client that says, don't buy ActiveBatch, buy our product, and that would also be fine. Yes, absolutely. What's not fine is a link that network automation uses that somehow infers that it's selling ActiveBatch. And it suggests ActiveBatch, absolutely, that if we have to look at the text of the ad as it would be viewed in isolation and say, is there anything, any characteristic that one could argue might suggest the ActiveBatch mark here, and there's not, there just isn't. Well, arguably, the fact that you used the word batch, it's not the exact mark, but the question is whether it's confusingly similar. That is, however, a generic description of both parties' products. Is it? I mean, that's one thing, but I understand what you do is you do some sort of job scheduling programs, the software that you're selling. Why does batch connote that? I don't think I'm going to be able to give the appropriate answer as to the technical meaning of why batch is used for that, but I don't think there's any argument about that issue, that it does describe both parties' products, and I think that opposing counsel would agree with that. I certainly don't think that there's an argument that we're prevented from describing our product as batch job scheduling. That is just what they both do. The technical meaning of the batch in that context or why it became to represent this type of product, I'm not fully equipped to answer. There's no evidence of actual confusion that I could find in the record. Am I right? That is correct. And on the other side of the coin, you didn't put in any evidence that there was no confusion. How would one prove that there wasn't any confusion? Well, I think that's a high bar for us to say, I guess, you know, I don't know how we … The district court called that factor neutral. Do you think it's correct to call that neutral? No, I think when there's no evidence of actual confusion, it should be weighed in our favor. Absolutely. But if I may, because I … So did I. I'll just telegraph that to the other side to think about it. And furthermore, you know, opposing counsel, I mean, they really, Active Batch relies on Playboy to such a degree, and I really would like to remind us that in Playboy, this court affirmed a denial of preliminary injunction. Playboy could not get a preliminary injunction in that action, where the ad was not labeled at all, where it had graphic content of the sort that Playboy isn't known for, and enticed users to click here or click here, which has some sort of arguably deceptive or alluring quality to it that certainly does not exist in our ad. And it led you to a confusing site. It wasn't segregated, identified as a sponsored mark. In 1991, I'm sorry, in 2001, when we weren't quite familiar with the mechanics of Internet use and searching, which we are much more so familiar with now, I think that certainly Playboy does not set a precedent for granting a preliminary injunction in running out of time. Don't you think there's a distinction between domain names and the searches, that kind of analysis that you applied to that, that we did in Playboy and Brookfield, from this sort of... I don't think there's a meaningful... Because we're not going to, we're not looking at Web pages. We're not linking into Web pages here. Here we're doing a Google search. But that was the case. The ads were coming up also when you were searching for a Playboy appointment. It was the same there. With that, I have one minute. Okay. Thank you, Your Honor. All right. Good morning. My name is James Dorshew. I'm here on behalf of the appellee. I want to address the issues that you've already discussed, and I have some comments on my own. You indicated that they only use the word batch. That's not the case, Your Honor. They, in fact, use the word active batch. If you look at the search on Exhibit 1, it's, you'll see the words V, E underneath, and here's the word active. They use our exact trademark. This is not just a similar use. This is identical, and that was conceded as much below. Wait, I'm sorry. I don't see what that is. That's the word Google, Your Honor. Yes. Look, there's some green things that are impairing your ability to read under the text. Right. You see the word batch? That's the search name that a user puts in the computer. Okay. They have bought, through Google and Microsoft Bing, through the Internet provider, our exact trademark. So are you saying that's enough, just buying your name for this purpose? No. No. Comparative advertising is fine, but let's do it. Buy the name as a sponsored link and then put up a link that says, as we've talked about previously, don't buy active batch. Precisely. Precisely, and that's exactly what the precedent is in this circuit. And it would be confusing if they had a link that said, suggested network automation sold active batch. But this is neither. This, in their ad, makes no mention of our product, of why their product is better than ours, why it costs less, why it's superior. The only thing they've done here. Well, if it makes no mention of your product, how do we have trademark confusion? Well, you have it in the search name. This is part of the initial interest confusion, because what they're doing is, it's like, if I run the word McDonald's and I thought. . . In and of itself, that is not. But one of the sleeper factors, as you know, is the similarity of the marks that are used. What they're doing here is they've purchased our trademark. But what are the two marks that are similar here? What's similar is they've bought our exact trademark. There's nothing different between what they're using and what we own. It's identical. So you don't have two different marks. It's a completely different context, isn't it? Well, what you have, sir, is you're using somebody else's trademark, the identical trademark, in order to divert business to you. It's one thing to say, as you noted, I'd like to know what the relative strengths and weaknesses of the products are. But as you see what their ad is, if you look to the right in what they call a sponsored link, and you're absolutely right, there's no evidence before the court below about what a consumer would be in this case. There's no evidence. These are all based on inference presumptions that they are now arguing, too. In fact, they didn't even argue to Judge Marshall below. Well, isn't it a fair inference that if I'm going to spend $10,000 on a job scheduler software, that I'm a somewhat sophisticated user of the Internet? You've taken the high end of the range, Your Honor. $1,000 to $10,000? I'm a district judge, so $1,000 is a lot to me. Well, understand, I don't mean to be arrogant, but, you know, we're not dealing with household names here. You're dealing with marks. The other thing I would point out to you, and this is exactly what Judge Carney decided in the Finance Express case. It's identical. This is not an extension of Ninth Circuit law. If you read his decision, we're dealing with an ad. The words network automation, which they say you should assume would lead a consumer, without any evidence of this, to believe that they are different from us, even though they've used our name to divert people to their sponsored link. They bought our ad so that people would go to them. It would be one thing if you said, go to our network automation line. If you look at the ad, they use generic terms like batch, job scheduling, Windows job scheduler. They don't say anything like this is an alternative to ActiveX. They do nothing to differentiate themselves from us, having used our mark in the first instance to divert customer attention to them. If an ad is clearly labeled, and this is your law, this is the Ninth Circuit's law under the initial interest infusion doctrine. If it's clearly labeled, the court has suggested that that might be sufficient in order to avoid trademark liability. This is the classic case of somebody who is not interested in comparing their product with somebody else's, but somebody who is interested in diverting attention to themselves by using somebody else's registered, in this case, incontestable trademark. Isn't your whole position really a dispute or a problem you have with the architecture of Google searching? Not at all. If you just have that and nothing else, you still have a... And that's what's wrong with the per se argument that's made in their brief. They're saying to you that you will always find trademark infringement in these circumstances. They didn't have to use the word active batch as a search name. They could have used batch or, you know, they could have even used their own name, network automation. They instead chose to want to capitalize on our rule. That's my real question, is if all they do is use active batch as a search term, which gets back to the architecture of Google searching, and they do nothing else that's designed to be confusing, then you would still advance the same claim, wouldn't you? You have to do a... Wouldn't you? No, I would not, Your Honor, because you have to look at, if they had in their ad, if they had in their ad words to the effect that we are an alternative to active batch or automated, or active batch, our products are better, or there's nothing in here that compares our products. They want to leave it purposely vague. I understand that at one end of the continuum, you have no problem with direct comparison advertising. But if you move the ball just a little bit towards midfield, where there's no direct comparison and no direct confusion, that is, no use of active batch in the link, then don't you have just a problem with the Google search? Well, the Google search is what is being used in order to create initial interest confusion. Let me make sure I understand at least one thing then. Yeah. Is it your position that there's anything confusing about the sponsored link, in terms of trademark confusion, about the sponsored link, totally independent of the Google search? Yes. Yes, there is. And that is the absence of any comparative information or any identifier of source in a clear, concise manner so that the consumer knows that they're dealing with a different company. Well, if you had two stores side by side and all you had was two competitors and the one competitor did nothing to directly compare. He just sold his shoes and another store sold their shoes. Is that trademark confusion? Well, let's assume that in your hypothetical that the adjoining store owner has above his store our trademark. And in a very small font in print, he uses a generic word. Let's assume he's a clothing retailer. His name is Clothier. Well, you've cleverly changed the hypothetical to win the argument. What I'm really getting at is what do you have here that shows trademark confusion independent, totally independent of the link itself, of the Google search? The link itself does not. That goes to the level of whether a link, as this Court has suggested, might relieve somebody under the Fair Use Doctrine from trademark liability. It goes to the offensive issue, whether it's clearly labeled. This is not a clearly labeled ad. This doesn't do anything to identify source, to compare products, or do anything else. It's the absence of information that deprives them of the ability to say it is a fair use. There is clear trademark infringement under the sleek craft analysis as refined by this Court to look at at most three important factors. And it doesn't always, contrary to what counsel has argued, result in trademark infringement. The strength of the mark, an incontestable mark, similarity of the mark, they're using our identical mark as a search engine. How can you engage in a factor that says compare the two marks when there's only one mark? Your Honor, if I use McDonald's and I don't use my own mark, there's still trademark infringement. If I want to open a hamburger store, I put it next to my home in Calabasas. Well, I think what's good, I mean, in Brookfield, which was the first in these series of cases, we came up with like a twist on trademark confusion in the world of Internet domain names and said that there's a type of confusion that's protected against by the trademark laws, which is initial interest confusion. And that is not the same confusion as the traditional source confusion. I think that's what you, this argument going back and forth is not making clear. I mean, your argument is based on initial interest confusion. You're saying that they input ActiveBatch, which is your trademark, up pops this other company's product, and there's nothing to say that it's not the ActiveBatch. The infringement is in the act of searching for the name. They could have used a search word like batch. And in the words that we usually use, you're talking about initial interest confusion. That's correct. What evidence was there of initial interest confusion? Sleek prayer pastors, again, Your Honor. What evidence? I mean, I'm very used to expert studies and all that kind of stuff. There's nothing like that in this case. We're at a preliminary injunction stage, and I agree with you, Your Honor. But let me just first address your question about there's no actual confusion in the record. Initial interest confusion, as you know, by definition, is a doctrine that provides that even if the consumer ultimately realizes, after it goes to the computer. I understand that. I'm after the evidence. There is none. That seems to me kind of suspicious, if you want to put it that way. Let's say that we get rid of this injunction. Okay? What happens next? Take me through how the trial or what procedure will happen in the court. We reverse and we send it back. Tell me exactly what happens. We still have to do a sleep prayer analysis, don't we, Your Honor? And that's what the court did in the first instance. We have said in Playboy that we apply those factors flexibly in this context and that some factors have more importance than others. And I think that goes back to the very first question that Judge Mossman or maybe Judge Trott asked, which is what is the most important factor here. And I think that that has to do with the sophistication of the user and what they would reasonably believe. You're absolutely right. We would have survey evidence. We would hire experts to look to see whether consumers were confused as to what this type of mark. We provided you with some studies already that you might have seen. And you haven't done that. But, Your Honor, when you're moving for a temporary restraining order or a preliminary injunction in the case at the outset and you're suffering irreparable harm, as we have here, and our business is being diverted, a district court judge has to apply and determine whether there's a likelihood of success on the merits. I can't always create a record as a trial lawyer at that early stage in a proceeding with this type of extinguishing. The court was asked to look, as other courts, including Judge Carney and Finance Express have done. And, by the way, the Playboy Court didn't deny a preliminary injunction. The lower court did. And it granted summary judgment in favor of the defendant. That was the issue. It was appeal, and the court reversed the summary judgment. So that's a misnomer. On the expert study alone, that's what they said. The expert study establishes a strong likelihood. Thus, factor four alone probably suffices to reverse the grant of summary judgment. And that's in a summary judgment context. But when you're 30 days or 60 days into the lawsuit, Your Honor, with all due respect, the practical reality of what I have to do as a trial lawyer is gather as much evidence as I can. You have evidence on all of the sleep craft factors here that Judge Marshall carefully considered. And I guess the question for you, was there a clear error here? She did more than that. She applied them flexibly. She looked at whether they're using our identical marks. She found that they were. She looked at whether or not we're in the same market, which we are. She looked at whether we're competitors, which they admit we are. These folks didn't contest five, six of these sleep craft factors. And then she looked to make sure that there was no First Amendment issue as to whether or not there was a clearly labeled ad in this case. The words network automation are generic terms like active, like batching. Let's say you survive summary judgment. You've got your studies. You go to trial, right? Yep. Let's say you win. What do you ask for? Among other things, we're clearly going to ask for injunctive relief. And what else? Are we going to ask for damages? I'd have to see whether there's any lost sales. But as you know, there's a presumption of irreparable injury in a trademark case. eBay applies to a patent case. I've seen that issue brief. But more than that, there is evidence in this record to show that as numerous courts, including this court, have held that in a trademark context, loss of reputation, goodwill, and business are present in these circumstances when somebody else is using your identical mark in a good. What sort of injunction would you be asking for? I'm sorry? What sort of injunction would you be asking for? Well, that's frankly one of the difficult challenges in this case because you've got to carve an injunction that is sufficient to protect the trademark owner, which I think is what Judge Marshall did in this case, and still allow fair use and comparative advertising. So I assume the injunction would not prohibit the sponsored link system itself. It wouldn't prohibit buying a sponsored link that used a competitor's trademark. Not per se. Then you get to the issue of whether or not the label is clearly identified or not. This is part of the problem that I have with the position of the appellant in this case, is they want you to render an advisory opinion as they want a Judge Marshall to do. You are presented with the facts of the specific case here. If I could just follow up for a second. Yeah. You wouldn't enjoin then purchasing a sponsored link with your ActiveBatch name. If there was a sponsored link, as you see on Exhibit 1, Your Honor, and that said network automation is a competitor of ActiveBatch or words to that effect, will we offer it? I sell similar products. Exactly. That would be a sort of a positive injunction. You would require them to engage in direct comparison. Yeah. I mean, I think the injunction would have to be something along the lines that comparative advertising is permitted, the use of the term or the mark. I can use the word McDonald's in a comparative ad as I would with Burger King to describe that we have more beef in our hamburgers or that, you know, our price is cheaper or that we're better or that we're more efficient. This is just a clear effort to use our mark to divert to somebody, to them, without explaining that they're anyone different, that they're not sponsored, associated or affiliated. All right. Well, counsel argues that the injunction that was issued is overbroad. Counsel argues, opposing counsel argues that the injunction that was issued is overbroad because it prohibits uses that are permitted under trademark law. Okay. A couple thoughts, and this is all again in our brief, Your Honor, but I will repeat them for your benefit this morning. Number one, these arguments were not made. Judge Marshall repeatedly asked counsel below, how would you modify this injunction if I were to do so? And counsel said to the court, I really can't answer that for you because I don't know what it is that you would permit or not permit. But Judge Marshall invited that, and if you read the transcript of the hearing, you will see there was a dialogue on that very issue, and Mr. Blakely at that point really was unable to afford her with any guidance. So. Would you agree that point one of the injunction is overbroad? I think, Your Honor, that what should be done in point one of the injunction is that it should be narrowed to provide that it should allow fair use. And how we would exactly frame that, I think that's an appropriate revision to the injunction in this case. And I'm being completely honest with you. As I read it over in preparing for the hearing with you this morning, I can see how that is. Well, is there any part of point one that you think is allowable as an injunction? Say it again, Your Honor. What part of point one would you preserve in an injunction? The complete prohibition of the use of the term active batch on the Internet or in comparing products in the manner that Judge Marshall said. I think what should be put in there is a qualifier that says, unless counsel or the parties can demonstrate that what is being used is, in fact, either clearly identified advertisement or comparative advertising under the fair use doctrine or something comparable to that. Well, it prohibits using active batch in a search string or keyword in search engine advertising. Would you allow that? Do you contend that's allowable as an injunction or not? No. No, Your Honor. All right. For the reason I just stated. You need to clearly label that. That's the difficulty here. It's not the use of the search name in and of itself. As I say, I can use the word McDonald's to compare my hamburger to somebody else's. It's the failure in this case to provide any identification of source in a meaningful way or to do real comparative advertising. One other point is the district court did find that active batch is distinctive. The opposing counsel was arguing today that batch, as they use it, is a generic-type term like Kleenex. I don't think that argument is being made, Your Honor. In fact, they never made it below, and I don't recall reading any of the words here. Active batch is the morph that we own, and that's the exact morph they admit that they use. As I said, this is masked in part on Exhibit 1, so you can't see the words active before the word morph. You see the letter VE after the next group? No, I see it. I see it now. So, but as this Court has also said in numerous decisions, when you're using the exact same identical mark and you're dealing with competitors in the exact same product line in circumstances like this, the strength of the mark, which is an argument they never made to the district court below, is being made for the first time now. In fact, it wasn't even addressed in their reply. In response to a question from the Court, the answer was that batch is a more generic term. Do you agree or disagree? The word batch itself? Yes. Well, the word batch implies job scheduling in and of itself. I just want to know whether you agree or disagree with the idea that batch is a somewhat generic term in the industry. It is like network automation is a generic term, if it's alone. When you use the words active batch, though, in this case, you're going to have to All right. That's fine. I have one more question. Sure. What does sponsored links mean? As I understand it, Your Honor, and I'm not an Internet expert, but let me give you my best shot. What Google and other Internet providers do is they provide a service to advertisers and to the public. And what you do is they sell search names. And this is very well spelled out in the number of your decisions, Clayboy and Brookfield as well. But what they do is they sell search names to companies like network automation. And they don't, unlike the United States Patent and Trademark Office, they don't police what they're selling to determine whether or not, by selling it, somebody might be infringing somebody else's rights, including a trademark right. And that's been part of the reason we've had so much litigation involving Google and others. But what happens is you put in a search name, and then when you put that search name in, there are sponsored links that will appear. Sponsored by whom? It's sponsored. I just read that and I started, I never paid much attention to that. Sponsored by Google? Sponsored by? It's a market-driven issue because what happens is you have to buy the advertising. It's like if I go on TV and buy an ad on television, I'm a sponsored advertiser in that context because I buy airtime on the television network. That's what sponsored link means. You are not the organic or the originator of that name, but you are seeking to derive some association or affiliation with that name. And that's part of the problem we're dealing with here. They could have used any number of different search names. Have people sued, have there been lawsuits against Google for selling trademarked search links? I haven't studied that issue, Judge Wardlow, but in the course of my reading, in this case and others, I believe there has been litigation against Google and others. In fact, I think there's pending litigation against them involving the selling of marks and whether there is some kind of collusion or conspiracy theory or inducement to infringe theories that some of the courts are currently grappling with. Is there a possible Lanham Act cause of action lurking around in all this stuff? Well, this is a Lanham Act in the sense that it arises under the trademark. But under the trademark, but other than under the trademark. Well, we do have a state unfair competition claim under Business Professions Code. These are standard claims that lawyers like me bring and make your life all the more difficult in bringing, but we bring as many claims as we can that might subsume this issue. But again, just in closing, unless there's any more I can answer for you, I would really commend you to read Judge Carney's decision, Finance Express, which is directly on point with this. This is a deliberate effort to capitalize on a registered and incontestable trademark. There's no comparative advertising going here. There's an effort to use our name to divert customers. And I will submit to you that is exactly what the initial interest confusion doctrine intended to cover. All right. Thank you, counsel. We will give you a few minutes extra, given that we gave opposing counsel extra as well. Thank you. I'd like to first address the fact that, as Your Honor, Wardlaw is familiar having been on the panel with Brookfield, in Brookfield it was noted that users assume, as a rule of thumb, that the domain name of a particular company will be the name of the company followed by .com. That's why it's customary for trademark holders, including Apelli, to use their trademark to identify the owner of the URL. This is the way that it's done. There's nothing different about our ad inputting www.networkautomation.com as our source identifier. This is the, I have not seen it done any other way. The fact that Network Automation paid for the right to display its ad in a strategic location, where it will be visible to consumers interested in their product, does not transform this ad into a misleading, deceptive ad under trademark law. The practice of advertising to competitors' customers is permitted in the brick-and-mortar context. It's important to competition. And yes, we do not contest. We'd like to advertise in a fair, non-confusing, non-misleading way to people that might be interested in their product, because we feel we have a better, competitive, better-priced product. What is the name of your product? Our name, well, the Network Automation is an ad, oh my gosh. That's the name of your company and one of your domain names. What's the name of your product? Automate. Automate. It's Automate, yeah. And we do have that trademark. And as far as not having suggested for the breadth of the injunction discussion, I'd like to, the record, it just absolutely contradicts what he's saying, that we didn't provide alternative examples of an injunction that might be okay. We provided very specific examples that are in the record. Well, looking at this injunction, if we were to affirm the district court that decided that the injunction had to be narrowed, how would you narrow it? Well, I would think that the public really needs some guidance on this issue. So I would go beyond saying, oh, it needs to be clearly labeled, because that's the problem. We don't know how to do that. We're happy to do that. I think that there is something that is permissible beyond having to say our product is better than theirs. But at a minimum, certainly that is supported and has to be allowed. But I think that there should be a legal, permissible manner in which we can advertise the way that we do in the brick-and-mortar context in a strategic location in a way that's not confusing, without having to have essentially two forms of advertisements. Every company would have to have one advertisement they use for, say, someone's looking for a batch job scheduling, and they put that in. They're going to get their products, and they're going to get our products. And they're going to have advertisements side by side. And that, no one's going to say, is confusing, is trademark confusion. Yet if they use, if it's key to their search term, we now have to have a different ad that is going to have different text in it. At a minimum, yes, it would have to be compared to that. I think we can do something beyond that. I don't think that the law supports restricting competition on the Internet in a manner that is not restricted in the real world. Well, what about just having the name of your product to distinguish it from the other product? You don't have the name of your product. We offered that to the court, to the district court. It was rejected. Again, I would point you to the record, 42 to 51. We gave specific examples. We said, would this be okay, Your Honor? We have automate with our trademark symbol on the second line. Is this okay? What can we do? We don't want to deceive customers. We don't want to incur litigation costs. We don't want to be in this fight. We would like to advertise. Okay, but your argument to me is the credibility of your argument is diminished a bit by the fact that nowhere on the results from ActiveBatch does your product actually come up. Because on the organic search results, we don't have anything hidden in our metatext that suggests that we are competing. What you do is sell a competing product, but you don't even indicate the product. Okay, we would have gladly, we had offered beforehand to include automate in our ad. We offered to the court. We offered to opposing counsel prior. That was not sufficient to them. As far as the search results and the organic search results, that's just because in the content of our site, nowhere do we mention their mark. And I think the algorithm that Google uses searches the content of sites for mentions of ActiveBatch and identifies those as organic results, and the only reason ours comes up, yes, it's correct, is because we said to Google, when Google says, essentially, where should we show your ad? Where should we show your sponsored link? Where do you want it? Well, we want it here. This is a comparable competitive product, and we think consumers will be interested in our product if they're looking for them. Let's identify it as a sponsored link. Let's make our product clear. We're not trying to deceive them, but we would like the opportunity to advertise to them, as we're able to do in the real world. Judge Marshall says defendant argues and plaintiff does not dispute that plaintiff will incur little or no cost by ceasing plaintiff's use of the ActiveBatch mark. Plaintiff will not lose an advertising mechanism and must simply use different keywords to trigger plaintiff's advertisements. No balance of hardships, not a problem. It's not that it would be so difficult, except for that it seems to be impinging upon a legal right that we should have to advertise to the public. So there's no hardship then? I think that to the extent that customers would be interested in our product and would not have the opportunity to view it, we could conceivably lose customers. Conceivably, you're getting awfully vague here. I don't see any hardship. In our saying to Google, hey, remove our ad, we've already done that at this point. Little or no cost by ceasing plaintiff's use of the ActiveBatch mark. What hardship will you suffer? I mean, not could or should or would, but what hardship? Is there any showing of a hardship here? Well, the right to advertise, I think, to people interested in our product is a hardship. If any company is prohibited from advertising to potentially interested in customers to target their ads and to make it more efficient. Well, she says you can advertise in another way. You just use different keywords to trigger. Well, sure, but we would be limited. We would not be able to advertise to this group of customers. You'd lose the rights of competitive advertising, direct competitive advertising. Yeah, and we're not trying to obfuscate the fact that that is what we're trying to do. You could advertise your own product a lot of ways, but if you want to aggressively go after ActiveBatch customers, you've got to link to ActiveBatch. This is the future of advertising. It's becoming more and more targeted. I don't know if you followed it, but it seems to be working, and we're tailoring. We're not advertising to people looking for hamburgers. We're advertising to people looking for this product. We're not advertising to someone looking for Nike shoes. We're advertising to someone looking for a comparable product that we think we can provide a good offer on. We want this information available. It would be, I think, really anomalous if trademark law, which is supposed to benefit the consumer and lower consumer search costs, were somehow used to whittle away and limit competitive advertising in a way which no one argues it's not permitted in the brick-and-mortar context. I must point you to a case, Toyota v. Tabari, 610F3D1171, and it overturned a similar blanket injunction. It wasn't concerning keywords. Was this case in your brief? No, it's not. Is it a recent case? As we were, yes. So you didn't submit a 28-J letter? Should I do that? Yeah. Okay. I'm happy to do that. It doesn't address this issue exactly on point, but as far as the overbreadth of an injunction that limits free speech, it does say that it raises serious risks. You really should just jot it down on a piece of paper and give it to the clerk. Okay, absolutely. I will do that. But, again, the statements that they made throughout the brief, which we've mentioned in our reply, we're being deceptive. We've in no way identified our product or in no way identified our company, and it's just not true. We use the exact same manner of source identification that they use and that everyone uses. So I think at a minimum, absolutely, the injunction needs to be vacated and tailored. But I think beyond that, there is just no precedent for saying that the mere use of the keyword as a search term gets you to the preliminary injunction standard. It's just as far as the confusion a little bit about Playboy, it was an unpublished decision that this Court affirmed the preliminary injunction. The case that they're citing, yes, is later on in the case's evolution when it was at the summary injunction stage. Okay, counsel, you're way, way, way over your time in going into areas already covered. Thank you very much. Okay, Network Automation Inc. versus Advanced Systems Concepts is submitted. We'll take up Quinteros-Ramos versus Holder. Thank you very much. Thank you, and I hope that everything is well or gets better. Is counsel here on Quinteros-Ramos versus Holder? Thank you.
judges: Mosman, Trott, Wardlaw